Mrs. Nathan Murov v. Commissioner.
Murov v. Commissioner
Docket No. 24828.
United States Tax Court
1950 Tax Ct. Memo LEXIS 32; 9 T.C.M. (CCH) 1050; T.C.M. (RIA) 50283; November 27, 1950
*32 W. S. Wilkinson, Esq., Box 1707, Shreveport, La., for the petitioner. J. L. Bailey, Esq., for the respondent. JOHNSON
Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined a deficiency in petitioner's income tax in the amount of $5,789.60 for the calendar year 1944. The sole issue is whether a valid partnership existed between petitioner's husband and other members of their family. If so, petitioner correctly reported her income. If not, the entire income from the business in question was the community income of petitioner and her husband, as determined by respondent. Other adjustments by the Commissioner were not contested. Findings of Fact Petitioner is a resident of Shreveport, Louisiana, and is the surviving widow of Nathan Murov, who died in November, 1947. For 1944, the taxable year in question, she filed an income tax return at New Orleans, Louisiana, on a community property basis. Petitioner's husband, Nathan Murov, sometimes herein called "Nathan", was a merchant and continuously from 1915, as sole proprietor, was engaged in the retail furniture business at Shreveport, Louisiana, using the trade name of New York Furniture *33 Company. In 1933 his health failed and he was thereafter unable to manage the business and his son, Joe Murov, sometimes herein called "Joe", who had been working in the store since 1930, assumed the management of the business, assisted by his brother, Abie Murov, hereinafter called "Abie". On January 2, 1935, Nathan entered into a written contract of partnership with Joe, then aged 25, and Abie, aged 21, which contract of partnership was substantially as follows: After the preliminaries and a statement that Nathan had been engaged in the furniture business for many years, it continued: "WHEREAS, said Nathan Murov, due to illness, has been unable to carry on actively the affairs of said business, and, "WHEREAS, Joe Murov and Abie Murov for the past few years have carried on successfully the affairs and activities of the aforesaid New York Furniture Company. "NOW THIS AGREEMENT WITNESSETH: That for and in consideration of the services rendered by said Joe Murov and said Abie Murov, and their agreement to devote their entire time, skill, energy, and industry to the best interest of the business being operated under the name and style of the New York Furniture Company, as aforesaid, *34 a commercial partnership for the carrying on of said retail furniture business under the name and style of the New York Furniture Company, hereby is formed between said Nathan Murov, Joe Murov and Abie Murov, with the profits arising out of the conduct of said business to be divided between the partners in the following proportions, to-wit: Nathan Murov, Sixty (60%) per cent. Joe Murov, Twenty (20%) per cent. Abie Murov, Twenty (20%) per cent. "This agreement of partnership to be effective from the date hereof." On January 4, 1937, Walter Wolens, sometimes herein called "Wolens", a son-in-law of Nathan and petitioner and who for nearly a year had been employed by the firm, was admitted as a partner, and a new partnership agreement in writing was executed by Nathan, Joe, Abie and Wolens. It recited that Wolens had been actively connected with the business and "in consideration of services rendered" by him "and his agreement to devote his entire time, skill, energy, and industry to the best interest of the business", a partnership was formed between him and the other parties "with the profits arising out of the conduct of said business to be divided between the partners" in these *35 proportions: Nathan 52 per cent; and to Joe, Abie and Wolens, 16 per cent each. Neither of the partnership agreement was recorded. Joe, Abie and Wolens contributed no capital to the business, all of same being furnished by Nathan. On January 3, 1941, a supplementary agreement was executed by the four partners, hereinafter called the "1941 agreement". It referred to the two prior partnership agreements and added some new provisions thereto, including the statement that Nathan Murov had full power to discharge or sever the connections of his three junior partners at any time and forbidding any of the junior partners from selling or encumbering any right that they had in the profits of the business. It further provided that no one of the junior partners should draw out of any profits standing to his credit on the books of the business in excess of $4,000 in any year without the consent of Nathan Murov. The declaration and agreement contained a further stiplation that if any of the junior partners should withdraw from the business, he would be entitled to receive no more than 40 per cent of the amounts standing to his credit on the books of the business without the consent of Nathan *36 Murov. The 1941 agreement was not intended to cancel or annul the ownership or interest of Joe, Abie or Wolens in the business. Its purpose was to discourage excessive expenditures by these younger members of the firm and by preventing a withdrawal of their full percentages of profits there was maintained adequate working capital and accumulation of capital for the future needs of the firm. The restriction upon hypothecation or sale of their interest was to keep the firm intact and prevent its dissolution. The limitation of $4,000 annual withdrawal by these junior partners was not always observed, and they did in fact withdraw sums in excess thereof on many occasions without Nathan's consent. It was always understood that the capital accounts of these junior members of the firm belonged to them, and each of them has at all times been recognized as the owner of the accumulated profits represented by his respective capital account, as shown by the books of the partnership. Nathan did not, during his lifetime, nor has his widow or other heirs since his death claimed that Nathan had any title or claim of ownership to the capital accounts standing in the name of these junior partners. *37 In 1945, one year after the taxable year in question, another partnership agreement was executed by the parties, bringing into the firm two of the other Murov children, and this 1945 agreement contained the same restrictions as those in the 1941 agreement. The books of the firm, beginning with 1937, at all times contained separate capital accounts for Nathan, Joe, Abie and Wolens and the withdrawals by each. The table below contains such figures for the years indicated: NEW YORK FURNITURE COMPANY
Statement of Partners' Accounts
NATHAN MUROV:
1941
1942
1943
1944
Capital Account 1-1
$189,628.86
$209,840.97
$187,509.53
$134,626.81
Net Income
26,226.40
6,884.73
18,488.14
21,488.30
Total
$215,855.26
$216,725.70
$205,997.67
$156,115.11
Withdrawals
6,014.29
29,216.17
71,370.86
45,524.01
CAPITAL ACCOUNT 12-31
$209,840.97
$187,509.53
$134,626.81
$110,591.10
JOE MUROV: Capital Account 1-1
$ 27,107.33
$ 32,166.68
$ 31,787.59
$ 35,961.04
Net Income
9,869.66
5,118.38
8,688.66
9,911.79
Total
$ 36,976.99
$ 37,285.06
$ 40,476.25
$ 45,872.83
Withdrawals
4,810.31
5,497.47
4,515.21
7,815.55
CAPITAL ACCOUNT 12-31
$ 32,166.68
$ 31,787.59
$ 35,961.04
$ 38,057.28
ABIE MUROV: Capital Account 1-1
$ 26,725.88
$ 33,618.09
$ 33,578.41
$ 38,539.17
Net Income
9,269.66
3,918.37
7,488.65
8,711.78
Total
$ 35,995.54
$ 37,536.46
$ 41,067.06
$ 47,250.95
Withdrawals
2,377.45
3,958.05
2,527.89
2,669.85
CAPITAL ACCOUNT 12-31
$ 33,618.09
$ 33,578.41
$ 38,539.17
$ 44,581.10
WALTER WOLENS: Capital Account 1-1
$ 13,955.90
$ 20,938.20
$ 16,199.28
$ 19,834.29
Net Income
10,469.66
5,118.38
8,688.66
9,911.79
Total
$ 24,425.56
$ 26,056.58
$ 24,887.94
$ 29,746.08
Withdrawals
3,487.36
9,857.30
5,053.65
6,130.17
CAPITAL ACCOUNT 12-31
$ 20,938.20
$ 16,199.28
$ 19,834.29
$ 23,615.91
*38 While the written partnership agreements of 1935 and 1937 contained no reference to losses, but only to profits, it was understood by the parties thereto that they would each share losses proportionate to their interest, and such was done. After the 1937 partnership agreement and in each year thereafter statements as a basis of credit were furnished by the firm to the First National Bank, with which it did business, giving the names of Nathan, Joe, Abie and Wolens as partners and stating the interest owned by each as contained in the agreement, and likewise similar statements were furnished to Dun & Bradstreet and also to Lyons, the latter a credit agency occupying the same place in the furniture business as Dun & Bradstreet do in the commercial world generally. Upon execution of the 1937 agreement, Nathan, Joe, Abie and Wolens associated themselves together as a partnership and carried on the business as such. Aside from contributing the capital to the business, Nathan, due to high blood pressure and heart ailment with which he had been afflicted since 1933, was not active in the management or operation of the business. He made occasional short visits to the store, [1] usually *39 about once a week, but at times his condition was such that a month or more would elapse between visits. The management and operation of the business devolved largely upon Joe, Abie and Wolens, Joe being regarded as the senior or managing partner, but all three of them consulted about and their combined judgment determined its business policies, and they each exercised authority and control, each having the right (1) to hire and fire employees [2]; (2) to sign the payroll; (3) to sign the firm's name to checks upon the bank. Abie was manager of the appliances department, Wolens of novelties and Joe in charge of buying, but was assisted therein by Wolens. Joe, Abie and Wolens each devoted his entire time to the business which prospered and expanded under their management, and the personal services of each contributed to the success of the business. Abie was in the armed forces of the United States from 1941 to 1945, but retained his interest in the business during such service, and upon release therefrom returned immediately to the firm's *40 business and devoted his full time thereto as he at all times had intended to do. While he was in the army, Abie gave Nathan power of attorney and he signed his name to all neccessary papers. During the period 1937 to 1944, inclusive, the New York Furniture Company each year filed a partnership return showing the names of the partners to be Nathan, Joe, Abie and Wolens and the distribution of its profits among them, and they each in said years filed an individual income tax return and reported the profits received therefrom. Louisiana being a community property state, petitioner and Nathan her husband in 1944 each filed an individual income tax return, wherein each reported as income one-half of Nathan's 52 per cent net profits which he received from the New York Furniture Company under the partnership agreement. The Commissioner determined the partnership was invalid and refused to recognize its existence, and after an adjustment, wherein he allowed Joe and Wolens $4,000 each for salary expenses, determined the entire net income from the business of the New York Furniture Company was taxable, one-half to petitioner and one-half to Nathan. Nathan, Joe, Abie and Wolens, acting *41 in good faith and with a business purpose, intended to join together as partners in carrying on the business of the New York Furniture Company, and in 1944 they were partners in the conduct of such business. Opinion Measured by the test prescribed in , we have found as an ultimate fact that a partnership existed in 1944 between petitioner's husband, their two sons and son-in-law. We deem it unnecessary to restate the facts upon which this conclusion is based. Our findings of fact set forth in detail the agreement, the conduct of the parties, their relationship to the business and numerous other circumstances which clearly establish that "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise", and did so associate themselves together in the conduct of the business. The partnership was formed in 1937, seven years prior to the taxable year in question, and it had been a going concern and a bona fide partnership continuously throughout and including 1944. We attach no significance to the parties' failure to file and record the articles of partnership, as *42 respondent points out the law of Louisiana required. The Supreme Court of Louisiana has held that such failure does not nullify or affect the validity of a partnership agreement. . The existence of the partnership was not concealed. Notice of its formation, its members and the interest owned by each was promptly furnished to the bank and credit agencies, which knowledge they and others had throughout the years of its existence, including the Federal Government, since partnership returns were made in each year after its formation. Respondent correctly states that Abie was unable to perform services for the partnership during 1944, because he was then in the armed forces of the United States. However, he acquired the status of a partner in 1937, four years before his induction into the army, and his entrance and service in the armed forces would not divest him of his interest in the partnership. . We cannot agree with respondent that the 1941 agreement "refutes any intent of the parties to join together in the present conduct of the affairs of the New York Furniture Company". The evidence *43 supports our finding that the agreement was not intended to have the effect that some of its language indicated, as Kelly, the firm's bookkeeper and confidant of Nathan and who discussed the agreement with him and the other parties, testified that it was a "bluff" designed to discourage excessive expenditures by the junior members and also to discourage their selling or hypothecating their stock. This and other evidence, when considered with the subsequent disregard of the terms of the agreement, warrants our conclusion as to its meaning and effect. Furthermore, it has been held in a family partnership the fact that the daughters were not able to withdraw their share of the profits without restraint and that the father retained control over such withdrawals, and that except for personal needs all profits were to remain in the business subject to the discretion of the father, was not inconsistent with the existence of a partnership. , aff'd . See also , and . The Commissioner erred in not recognizing the existence *44 of the partnership. Since other adjustments by the Commissioner were not contested, Decision will be entered under Rule 50. Footnotes
1. Upon such visits he would usually talk with the office manager and inspect the firm's check books. ↩
2. The firm had 15 employees in 1944.↩